Filed 1/3/14

CERTIFIED FOR PUBLICATION

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C066518 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F07350) |
| v. | |
| MATTHEW DOMINIC CARBONI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Lawrence G. Brown, Judge. Affirmed.

Aaron Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Stephen G. Herndon and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Matthew Dominic Carboni of possession of morphine, hydrocodone and diazepam as well as transportation of morphine and hydrocodone. The court granted Proposition 36 probation but stayed execution pending appellate review.

At issue here is the statutory interpretation of former Health and Safety Code section 11350, subdivision (a) (unless otherwise stated, statutory references that follow are to the Health and Safety Code) former section 11352, subdivision (a), and former section 11377, subdivision (a). Specifically we are asked to decide whether the so-called "prescription defense" set forth in those statutes is available to persons other than the person for whom the prescription was written.

We hold that it does not and affirm the judgment.

FACTS AND PROCEEDINGS

*The Prosecution Case.*

On September 29, 2009, at approximately 11:45 a.m., U.C. Davis Police Officer Maximiliano Thomas, patrolling a parking structure at the U.C. Davis Medical Center, heard tires screeching and stopped the car that made the noise. Defendant was driving the car and, when defendant was unable to provide Thomas with identification, Thomas placed him under arrest. Thomas then searched defendant and found 207 pills inside a prescription bottle in defendant's right front pants pocket. The bottle contained 192 morphine pills, seven hydrocodone pills, and nine diazepam pills. (We note that the total number of pills described adds to 208; the record does not explain the discrepancy.)

Thomas described the container in which he found the pills as both an "old-orange-prescription bottle with a white cap" with a Kaiser label and as a bottle with a scratched-off label. As Thomas searched the defendant he found $407 (three $100 bills, four $20 bills, four $5 bills, and seven $1 bills). Officer Thomas then took defendant to the U.C. Davis booking station where defendant made a tape-recorded statement.

2

Defendant said the pills belonged to him and identified them as morphine, "Norcos" (hydrocodone) for pain, and Valium (diazepam) for anxiety. The pills were later confirmed to be those controlled substances.

Defendant said he did not have a drug problem, denied selling the pills and told Officer Thomas the pills were for defendant's personal use. Defendant did not appear to be under the influence of any drugs and Thomas did not have defendant tested for any controlled substances. Defendant denied obtaining the pills at the hospital and said he had brought the pills with him although he would not say where he had gotten them.

Initially defendant also said he did not know how many pills were in the container, but when pressed for a number, defendant agreed that there were over 100, probably close to 200, morphine pills. Upon later questioning, defendant admitted he did not have a prescription for the pills.

*The Defense Case.*

Timothy T. testified for the defense and told the jury the pills defendant possessed were not defendant's pills--they belonged to Timothy T.

Timothy T. testified that on September 29, he had packed his household belongings to move from his home in Orangevale to a home in Fair Oaks. Other people helped including defendant who was a long time friend.

Timothy T. had many medical conditions for which he had been prescribed numerous medications. He had prostate cancer, had suffered strokes in the past, had sustained a previous head injury, suffered from seizures, and had trouble with incontinence. His medications included, among others, morphine, hydrocodone and diazepam. Timothy T. testified that he took at least 30 morphine tablets per day for pain as needed. He had been prescribed 420 morphine tablets and about 180 Vicodin or Norco (hydrocodone) tablets per month, and diazepam. He carried half of his morphine prescription with him in a pill bottle in which he also carried his prescribed hydrocodone

3

and diazepam. He kept multiple kinds of pills--primarily those prescribed for pain--in one prescription bottle because of the bulk of carrying several bottles in his pockets. He also kept a list of his prescriptions in his wallet in case he was ever stopped or questioned.

On the day of his move, Timothy T. was carrying his pill bottle in his shirt pocket. A friend accidentally backed a trailer into Timothy T., pinning him against the garage, leaving a line across Timothy T.'s chest and crushing the pill bottle. When the trailer moved away, Timothy T. fell and his pills spilled onto the ground. Defendant helped Timothy T. pick up the pills and Timothy T. gave the pills he had picked up to defendant to hold until they got to the new house.

Timothy T. also said that on September 29, 2009, Peggy O. was his caregiver and, later, his wife. Timothy T. did not recall whether Peggy O. came out to check on him after the trailer backed into him. He attributed his inability to remember to his head injury, seizures and many strokes. Timothy T. testified that he asked defendant to hold his pills for him because he did not know where Peggy O. was at the time and he did not have anything to put them in. Almost everything in the house, including his empty pill bottles, had been boxed up. Timothy T. explained that, although defendant had not been in charge of his pills, defendant was doing Timothy T. a favor by holding onto the pills because of the accident. Defendant had provided other assistance to Timothy T. in the past, including picking him up, feeding him, "babysitting" him, and doing all the "manly things" so Timothy T. would not feel embarrassed.

The parties stipulated that, as of September 29, 2009, Timothy T. had been prescribed the following medications: "One Aspirin, one Docusate, six Gabapentin, one Hydrochlorothiazide, Hydrocodone not to exceed eight pills a day, a half tablet of Lisinopril, 14 morphine pills, Oxycodone not to exceed four pills a day, half pills of Paroxetine, six Phenazopyridine pills and two Sennosides pills." The parties also stipulated that, based on Timothy T.'s "medical documents and valid prescription," he

4

was to take hydrocodone one to two tablets every eight hours as needed for pain, not to exceed eight pills a day, oxycodone as needed but not to exceed four pills a day, and five morphine pills in the morning, four in the afternoon, and five before bedtime for pain. When asked about having been prescribed 14 morphine tablets per day as opposed to 30 morphine pills a day he claimed to have been taking, Timothy T. testified that the dosages prescribed for morphine "changed all the time."

Peggy O. also testified to the events of September 29. Peggy O. had been in the house and ran outside when she heard the accident. As Timothy T.'s care provider, she coordinated his medications. Timothy T. had more than his usual three- or four-day supply of pain pills in his pill container on the day of his move because it was not a normal week due to the move. Timothy T. liked to control his pills, and Peggy O. and Timothy T. were taking a trip to Oregon after the move.

Peggy O. said that, after the pills spilled onto the ground, Timothy T. asked her if she had her purse to put the pills in, but she did not. Since she was wearing "sweats," she had no pockets and she could not keep the pills on her person. She went inside to look for anything they could put the pills in but Timothy T.'s empty, spare pill bottles had been boxed up for the move. They had no other containers--not even a plastic bag.

Peggy O. was concerned about children and animals finding the pills on the ground. She and defendant helped pick up the pills and she gave the pills she picked up to the defendant because Timothy T. had asked defendant to hold onto them. Peggy O. did think that perhaps it would be better for her to take the pills inside, but Timothy T. insisted that defendant take the pills, saying defendant "can handle it just fine." According to Peggy O., defendant said he could find something in his car to put the pills in, but she did not see where the pills were placed.

Peggy O. testified defendant helped her with Timothy T. "a lot."

K.P., a friend of Peggy O.'s, also testified and told the jury she had been helping with the move. K.P. had just met defendant on the day of the move. While she was

5

inside the house, K.P. heard a commotion, went to the door, and saw Timothy T. on the ground near a trailer with a lot of people around him. She knew that Timothy T. suffered from seizures and assumed that is what had occurred. She went back inside and was not aware at that time that Timothy T. had dropped his pills. Later, as she was leaving and walking to her car, she saw two pills on the ground. K.P. gave them to Peggy O. and she and Peggy O. then went out to look for more.

Defendant testified and told the jury he and others picked up the pills. He further testified, "They are all Tim's pills. He is dying of cancer. We want[ed] to give him back his medication," so they put the pills in an empty pill container defendant found by some garbage near the garage. Defendant testified he handed the container of pills they had picked up to Timothy T. The two of them went to defendant's car so defendant could drive Timothy T. to his new home. According to defendant, Timothy T. put the pill container, along with some other items, on the floorboard of defendant's car.

Before they could leave, defendant received a phone call about Ronnie B., a patient at U.C. Davis Medical Center. Ronnie B. suffered from cancer, was being discharged from the hospital and needed a ride. Defendant planned to pick Ronnie B. up, take him to his home, and return to Timothy T.'s home. Timothy T. did not go with defendant to the hospital. According to defendant, Timothy T. left the pill container on the floorboard of defendant's car along with some other items and asked defendant to take the pills to Timothy T.'s new house. Defendant put the pill container in the glove box.

The hospital was not ready to discharge Ronnie B. when defendant arrived sometime between 11:00 a.m. and 11:20 a.m. After visiting Ronnie B., defendant went back to his car around 11:45 a.m. He was concerned that he was driving a company car with someone else's pills so he put the pill container on the seat, explaining that he could either claim them or throw them out of the window if stopped by a law enforcement officer. As he started to leave his parking space, his tires screeched and he was stopped

6

by U.C. Davis Police Officer Thomas. When Thomas waved his flashlight for defendant to pull over, defendant took the container with the pills off the seat and put it in the pocket of his pants.

Defendant testified that he planned to return the pills to Timothy T., but after he was arrested, he told the officer that the pills were his because he was scared. He was worried about losing his job and about being in a company car. He did not want the car to be seized. He admitted it would have been better to tell the officer the pills belonged to someone else who had a prescription for them, but at the time he thought it would be better to "just take the blame for them and try to save the company vehicle, not get fired." He further testified, "I was willing to take the fall for the pills in order to not have my bosses and the company brought into this."

Defendant was familiar with the medications in the container because he had seen Peggy O. give them to Timothy T. when Timothy T. asked for them by name. In addition, defendant had been prescribed both diazepam and hydrocodone in the past; he had just recovered from a broken ankle. Defendant admitted that he had never been in charge of dispensing Timothy T.'s pills for him. He further admitted that he used "very poor judgment" when speaking to Officer Thomas by claiming numerous times that the pills belonged to him and by refusing to explain where he got the pills.

DISCUSSION

*The Scope of the "Prescription Defense"*

In this matter, defendant was charged in five counts with violations of former sections 11350, subdivision (a), 11352, subdivision (a), and 11377 subdivision (a).

At the time of trial, former section 11350, subdivision (a) provided in relevant part:

7

". . . every person who possesses [certain controlled substances] unless upon the written prescription of a physician . . . shall be punished by imprisonment in the state prison." (Stats. 2000, ch. 8, § 3, p. 50.)

Similarly, former section 11352, subdivision (a) provided;

". . . every person who transports [certain controlled substances] unless upon the written prescription of a physician . . . shall be punished by imprisonment in the state prison for three, four, or five years." (Stats. 2000, ch. 8, § 5, p. 51.)

Former section 11377, subdivision (a) provided, again in relevant part:

". . . every person who possesses [certain controlled substances] unless upon the prescription of a physician . . . shall be punished by imprisonment in a county jail for a period of not more than one year or in the state prison." (Stats. 2008, ch. 292, § 3, p. 2360.)

At trial, defendant requested the court instruct the jury on what has come to be referred to as the "prescription defense." Specifically, defendant asked the court to add the word "unlawfully" before the word "possessed" or "transported" in the first element of each instruction on possession and each instruction on transportation of a controlled substance. Defendant also asked the court to add to the instructions on both possession and transportation, an appropriate variation of the language relating to the prescription defense found in CALCRIM No. 2304 which reads as follows:

"The defendant is not guilty of possessing [a controlled substance] if (he/she) had a valid, written prescription for that substance from a physician . . . licensed to practice in California." (CALCRIM No. 2304.)

After much discussion, the trial court refused to so instruct which defendant now assigns as error.

The question is whether the prescription defense to possession or transportation of a controlled substance, available to a person for whom the prescription is written, extends also to others who possess or transport the controlled substance "consistent with the

8

prescription" or for the benefit of the prescription holder. We are thus asked to construe the relevant statutory language of former sections 11350 subdivision (a), 11352 subdivision (a), and 11377, subdivision (a).

The fundamental objective of statutory interpretation is to determine and effectuate legislative intent. (*People v. Trevino* (2001) 26 Cal.4th 237, 240.) To determine such intent, we look first to the words of the statute, giving them their usual and ordinary meaning. (*Id.* at p. 241.) When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. (*People v. Weidert* (1985) 39 Cal.3d 836, 843.)

The statutory language at issue in this matter is clear and unambiguous. As regularly understood, a prescription identifies both a controlled substance and a specific patient. Thus, the "person" to whom the language of the statutes applies is the person for whom the prescription was written. The words, "unless upon the written prescription of a physician, dentist, podiatrist, or veterinarian," in the sections at issue here, clearly modify the act of possession or transportation by the person for whom the prescription is written. (Former § 11350; see also former §§ 11352, 11377.) It is not enough that the drugs in question were *issued* pursuant to a valid prescription, to be possessed or transported later by anyone with a noncriminal reason for doing so.

We find support for our view of this matter in the California Supreme Court's opinion in *People v. Martin* (2001) 25 Cal.4th 1180 (*Martin*). In *Martin*, the court considered the scope of the "momentary" or "transitory" possession defense to possession of controlled substances.

"In *People v. Mijares* (1971) 6 Cal.3d 415 (*Mijares*), this court held that, under limited circumstances, momentary or transitory possession of an unlawful narcotic for the sole purpose of disposing of it can constitute a defense to a charge of criminal possession of the controlled substance. [Citation.] Nearly two decades later, the court in *People v. Cole* (1988) 202 Cal.App.3d 1439 (*Cole*) read our decision in *Mijares* as holding that

9

'possession of illegal drugs *solely for the purpose of disposal* does not constitute unlawful possession,' and further concluded the defense 'is not limited to possession for "brief moments" only.' [Citation.]" (*Martin, supra,* 25 Cal.4th at p. 1182.)

The *Martin* court ultimately concluded the holding in *Cole* was an overly-broad reading of *Mijares*. (*Martin, supra,* 25 Cal.4th at p. 1190.) Noting that case law has consistently held that the possession of enumerated controlled substances is unlawful " 'without regard to the [possessor's] specific intent in possessing the substance,' " (*id.* at p. 1190) the court held that the defense of transitory possession applied only to a momentary or transitory possession for the purpose of disposal. (*Id.* at p. 1191.)

Significantly, the *Martin* court agreed with the analytical underpinnings of the Court of Appeal decisions in *People v. Sullivan* (1989) 215 Cal.App.3d 1446, *People v. Hurtado* (1996) 47 Cal.App.4th 805, and *People v. Frazier* (1998) 63 Cal.App.4th 1307 (*Martin, supra,* 25 Cal.4th at p. 1190) each of which rejected the expansive reading of *Mijares* set forth in *Cole*. In each of those cases, the Court of Appeal disagreed with *Cole* because the *Cole* holding brought into question the subjective intent of the person possessing the controlled substances. As stated by the *Hurtado* court, ". . . expansion of the [momentary possession] defense to lengthier possession incidental to a defendant's 'intent' to dispose of those items rewrites the statutory requirements by introducing a new element of 'specific intent to retain.' " (*Hurtado,* at p. 814.)

So too here. To accept defendant's invitation to expand the scope of the prescription defense to persons other than those for whom the prescription is written so long as that possession or transportation was consistent with the prescription, rewrites the statutory requirements of the offenses at issue to add a specific intent to act in a way that is not consistent with the prescription even assuming those acts which are deemed consistent with the prescription could be determined in the first place. It would, moreover, add an element to the offense of possession or transportation to be proved beyond a reasonable doubt by the prosecution, that is, that the possession or

10

transportation was not consistent with the prescription.  Again, adopting the language of *Hurtado*, "we are not authorized to so revise the Legislature's description of a criminal offense."  (*Hurtado, supra,* 47 Cal.App.4th at p. 814.)

Of course this may create something of a legal conundrum, as restriction of the defense to the person for whom the prescription is written, in theory, makes criminal the possession and transportation of a prescribed controlled substance dispensed at a pharmacy to a person intending merely to take the controlled substance to a patient confined at home.  But, if this difficulty is at all significant in practical terms, it is for the Legislature, not the court, to remedy it.

Defendant argues that restricting the prescription defense to the person for whom the prescription was written leads to such absurd results that this cannot be what the Legislature intended.  Perhaps.  But we may take guidance from an observation made by Justice Holmes in the majority opinion he authored in *McBoyle v. United States* (1931) 283 U.S. 25 [75 L.Ed. 816].  There the question was whether a federal statute outlawing the interstate transportation of "an automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" covered the interstate transportation of an airplane.  (*Id*. at p. 26 [75 L.Ed. at p. 818].)  Deciding it did not, Justice Holmes cautioned:  "When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft, simply because it may seem to us that a similar policy applies, or upon the speculation that, if the legislature had thought of it, very likely broader words would have been used."  (*Id.* at p. 27 [75 L.Ed. at pp. 818-819].)

Defendant also argues that he should have the benefit of the *rule of lenity*, that is that the court should construe the statutory language in a light most favorable to defendant.  However, even where statutory language can be read in more than one way, the rule of lenity does not always apply.  (*People v. Manzo* (2012) 53 Cal.4th 880, 889.)  "Rather, the rule applies ' "only if the court can do no more than guess what the

11

legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule." ' [Citation.] In other words, 'the rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in relative equipoise . . . .' " ' [Citation.]" (*Ibid.*) We do not find the rule of lenity to apply here.

Our dissenting colleague places reliance on two Court of Appeal decisions and one California Attorney General's opinion.

In *People v. Ard* (1938) 25 Cal.App.2d 630 (*Ard*) the defendant was charged with and convicted of the possession of morphine and codeine. The defendant, a nurse, received the drugs for the use in care of a patient who held a prescription for them as the nurse was escorting the patient to Texas. Some 30 days after their arrival in Texas, the patient died and the defendant returned to California with the drugs where he was arrested. Affirming the judgment because the defendant continued to possess the drugs after the patient's death, the court observed that "at one time" the defendant came within the prescription exception, that is, before the patient's death. Upon the patient's demise the prescription exception no longer applied. (*Id*. at p. 631.)

Since the question before the *Ard* court was not whether the prescription defense was available to the defendant while he cared for the patient during the patient's lifetime, we consider the court's observation that the nurse had the benefit of the prescription defense "at one time" to be *dicta*. " 'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]' (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)" (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118.) Even if not *dicta*, we would respectfully disagree with the court's observation in *Ard*.

The dissent also relies on language in *People v. Wallace* (1952) 109 Cal.App.2d 676 (*Wallace*). There, on July 10, 1950, a visitor at the defendant's residence had a

12

prescription filled for 36 tablets of dolophine, a drug containing morphine. After the prescription holder took two tablets, he left, and left the bottle containing the remaining tablets at the defendant's residence. Upon finding the bottle, the defendant locked it in a jewelry box. The police executed a search warrant at the residence on July 26, 1950, and found the pill bottle by then containing only 27 tablets. (*Id*. at pp. 677-678.)

The defendant argued that when a guest legally obtains narcotics and then inadvertently leaves them in the home of the host who then locks them up for safekeeping, that act did not constitute an unlawful possession. The court observed that "[i]f [those] were the facts there might be merit in [the defendant's] argument." (*Wallace, supra*, 109 Cal.App.2d at p. 679.) But, the trial court found those were not the facts seen in the light most favorable to the prosecution which were instead, among other things, that the defendant admitted at the time of the search she knew the bottle contained dolophine, admitted the bottle belonged to her, admitted that she had consumed some of the tablets and claimed to have a prescription for the dolophine and that those facts were sufficient to discount the defendant's claim of mere safe-keeping for the prescription holder.

The *Wallace* court did say, "If the trial court had believed the testimony that appellant was merely the involuntary custodian of the tablets inadvertently left in her home by [the prescription holder], it would have been justified in finding that her possession was not unlawful." (*Wallace, supra*, 109 Cal.App.2d at p. 679.) Once again we consider these observations *dicta* and, once again, if not *dicta* we must disagree with the court's statements for the reasons stated earlier in our opinion.

Finally, defendant invites our attention to an opinion of the Attorney General which, he argues, supports his reading of the statute. In 1988, the Attorney General was asked to render an opinion whether a home care companion hired to perform services in the employer's home could lawfully administer drugs to or engage in nasogastric tube or gastrostomy feeding of the employer when the companion is (a) unlicensed and

13

uncertified, (b) a certified nurse assistant, or (c) a certified home health aide. The Attorney General concluded that "[a] home care companion hired to perform services in the employer's home, whether certified as a nurse assistant or home health aide or uncertified and unlicensed, may lawfully administer non-prescription drugs but not controlled substances to the employer in the employer's home; and may not lawfully engage in nasogastric tube or gastrostomy feeding of the employer in the employer's home." (71 Ops.Cal.Atty.Gen. 190 (1988).)

During the course of the Attorney General's analysis, he noted that possession of a controlled substance is a felony "unless upon the written prescription of a physician." The Attorney General then went on to observe "[w]e interpret this clause as removing the possession proscription on a controlled substance which has been lawfully prescribed for a patient by a practitioner from the patient and others whose possession of the drug is consistent with the prescription. (See *People v. Ard* (1938) 25 Cal.App.2d 630 and *People v. Wallace* (1952) 109 Cal.App.2d 676.) This permits a companion to handle a drug prescribed for his or [her] employer in ways that are consistent with the prescription short of actual administration of the drug and which do not constitute the practice of medicine or nursing." (71 Ops.Cal.Atty.Gen. at p. 193.)

First of all, we do not find the Attorney General's observation in this regard necessary to the opinion he rendered. He was asked whether home health care providers could administer drugs to their employer ("administer" meaning the direct application of a drug into the body of a person (71 Ops.Cal.Atty.Gen. at p. 193), not whether they were authorized to possess them generally. Second, and more importantly, in so opining, the Attorney General relied on *Ard* and *Wallace* which we have decided are not persuasive on the issue before us. Third, we simply disagree with the Attorney General's conclusions on this point for the reasons we have stated herein.

The trial judge did not err in refusing to instruct the jury on the prescription defense.

14

DISPOSITION

The judgment is affirmed.


_____HULL_____, Acting P. J.


I concur:


_____ROBIE_____, J.

MURRAY, J.

I respectfully dissent.

At issue here is the statutory interpretation of Health and Safety Code former sections 11350, subdivision (a)[1] and 11377, subdivision (a),[2] which provided that possession of specified controlled substances is not unlawful if the controlled substance is possessed "upon the . . . prescription of a physician . . ." and former section 11352, subdivision (a),[3] which provided that transportation of a controlled substance is not unlawful if the transportation is "upon the . . . prescription of a physician . . . ."

At trial, defendant presented evidence that the pills belonged to his friend, who had a valid prescription for them, and that his friend had asked defendant to transport the

---

[1] Undesignated statutory references are to the Health and Safety Code.

At the time of trial, section 11350, subdivision (a), provided: "Except as otherwise provided in [Division 10, Uniform Controlled Substances Act], every person who possesses [morphine or hydrocodone], unless *upon the written prescription of a physician*, dentist, podiatrist, or veterinarian licensed to practice in this state, shall be punished by imprisonment in the state prison." (Stats. 2000, ch. 8, § 3, p. 50, italics added.)

[2] At the time of trial, section 11377, subdivision (a), provided: "Except as authorized by law and as otherwise provided in subdivision (b) or Section 11375, or in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code, every person who possesses [diazepam], unless *upon the prescription of a physician*, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment in a county jail for a period of not more than one year or in the state prison." (Stats. 2008, ch. 292, § 3, p. 2360, italics added.)

[3] At the time of trial, section 11352, subdivision (a), provided: "Except as otherwise provided in [Division 10], every person who transports [morphine or hydrocodone], unless *upon the written prescription of a physician*, dentist, podiatrist, or veterinarian licensed to practice in this state, shall be punished by imprisonment in the state prison for three, four, or five years." (Stats. 2000, ch. 8, § 5, p. 51, italics added.)

1

pills to the friend's new residence.  Defense counsel initially requested the trial court to instruct on transitory possession and to add the word "unlawfully" to the instructions on the charged offenses.  He also complained that the prescription defense in CALCRIM No. 2304 was too narrow, as it applies only to the prescription holder and would result in absurd consequences.  After doing its own research and reviewing *People v. Ard* (1938) 25 Cal.App.2d 630 (*Ard*), *People v. Wallace* (1952) 109  Cal.App.2d 676 (*Wallace*), and an Attorney General opinion (71 Ops.Cal.Atty.Gen. 190 (1988)), the trial court rejected the request to instruct on transitory possession, but stated it would modify the prescription defense instruction to read, "[t]he defendant is not guilty of possessing [a controlled substance] if Timothy T[.] had a valid written prescription for that substance from a physician.  And the defendant . . . possessed the [controlled substance] . . . for purposes consistent with the prescription."  The court indicated there was substantial evidence to support such an instruction and it would be up to the jury as to whether it believed the defense story.  However, after an additional objection by the prosecution (which was registered at an unrecorded bench conference), the trial court ultimately declined to give the modified prescription drug defense instruction or to add the word "unlawfully" to the instructions on the charged offenses.  Defense counsel complained that this left defendant without a defense and requested the modified prescription defense instruction.  The court declined.

Defendant contends his possession and transportation of his friend's pills were consistent with the prescription his friend had for those pills.  He further contends that the trial court erred in refusing to instruct the jury that possession or transportation of a controlled substance is not unlawful when the possession or transportation is consistent with the prescription.

Unlike the majority, I do not view the statutory language as sufficiently clear to restrict the prescription defense to the prescription holder.  The statute is ambiguous.

2

Apart from the ambiguity, the unacceptable consequence of the majority's statutory construction of these provisions of the California Uniform Controlled Substances Act (hereafter CSA; § 11000 et seq.) is to criminalize common, everyday activity involving the handling of prescription medications by someone authorized to do so by the prescription holder.  This result was clearly not intended by the Legislature.  By adhering to principles of statutory construction, considering related statutes and applying the reasoning of prior decisional law, we can avoid this unintended result by construing the language, "upon the . . . prescription of a physician" to encompass possession and transportation of a controlled substance by a person other than the patient for whom the controlled substance was prescribed when the possession or transportation is consistent with the prescription.  Possession or transportation of a controlled substance is consistent with the prescription when the possession or transportation benefits the patient by facilitating the prescribed use of the drug.  Any possession or transportation that does not facilitate the prescribed use of the drug by the patient is inconsistent with the prescription and is unlawful.

Because the evidence supported the prescription defense as so construed, defendant was entitled to an instruction on the defense.  The failure to so instruct was not harmless.  Accordingly, I would reverse the judgment.

## A.  Statutory Construction

### 1.     General Principles

"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.  [Citation.]  We begin by examining the statute's words, giving them a plain and commonsense meaning.  [Citation.]  We do not, however, consider the statutory language 'in isolation.'  [Citation.]  Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . .  [Citation.]'  [Citation.]  That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute

. . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " (*People v. Murphy* (2001) 25 Cal.4th 136, 142 (*Murphy*).)

While we must ordinarily give a plain language reading to the words of a statute, it has long been a settled principle of statutory interpretation in our state that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend. (See *People v. Leiva* (2013) 56 Cal.4th 498, 506, 508, 510; *People v. Pieters* (1991) 52 Cal.3d 894, 898; *Younger v. Superior Court* (1978) 21 Cal.3d 102, 113.) Despite the fact that this court has analyzed the applicability of the absurd consequences exception or otherwise recognized the existence of this rule on occasions too numerous to cite here (e.g., *People v. Fenton* (1993) 20 Cal.App.4th 965, 969), the majority relies on a quotation involving the statutory interpretation of federal law to avoid application of the exception. (Maj. opn., p. 11.) I think Justice Holmes's observation has no application here. In interpreting the possession and transportation statutes, we are "*obligated* to 'adopt a common sense construction over one leading to mischief or absurdity.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 410 (*Greg F.*), italics added.)[4]

---

[4] When statutory language may reasonably be given more than one interpretation, courts look to a variety of extrinsic aids, including legislative history, public policy, and the statutory scheme of which the statute is a part. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265 (*Cornett*); *People v. Zambia* (2011) 51 Cal.4th 965, 972.) As originally enacted in 1929, a predecessor statute prohibited possession "excepting upon the written order or prescription of a physician." (Stats. 1929, ch. 216, § 1, pp. 380-381.) However, the available legislative history of the Health and Safety Code possession and transportation statutes does not expressly address the issue presented here.

## 2. Analysis

The majority concludes that the language of the statutes is unambiguous. They state that, because a prescription identifies a specific patient, the "person" to whom the language of the statutory prescription defense applies is necessarily limited to the patient for whom the prescription is written. However, by the express terms of the CSA statutes, "person" means the person who possesses or transports the controlled substance and the statutes do not expressly state that the only "person" who can transport or possess a controlled substance is the patient. The majority reasons that the language "upon a prescription" modifies the act of possession or transportation, and therefore legal possession or transportation is limited to the person for whom the prescription is written. (Maj. opn., p. 9.) No explanation is offered for this non sequitur. That a prescription identifies a specific patient does not suffice to limit the defense to the patient. Indeed, as I explain *post*, the CSA, as well as statutes governing pharmacies, recognize that a patient may depend on a household member or other agent or representative to handle the patient's prescription drugs.

Additionally, the majority's construction that the prescription defense applies only to the prescription holder leads to absurd results, and we are obligated to avoid a construction that results in absurdity. (*Greg F.*, *supra*, 55 Cal.4th at p. 410.) Under the majority's construction, common life experiences would be criminalized, such as the act of a person picking up a prescription from the pharmacy for an ill spouse, or retrieving medications from a medicine cabinet, or assisting in unscrewing a medicine bottle, or picking up medications that spill to the ground. Baby boomer adults would be prevented from obtaining their parents' medications from the pharmacy, transporting those medications, and otherwise possessing their parents' medications for the benefit of their parents. Friends, neighbors and others who might also assist a patient would face the same prohibition. A prescription holder who inadvertently leaves a prescribed controlled substance at the home of an acquaintance, friend or relative, would expose that

5

person to criminal liability.[5] " 'Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers -- one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity.' " (*People v. Clark (1966)* 241 Cal.App.2d 775, 780.)

I fully recognize that establishing public policy is a legislative function, not a judicial function. (*In re Firearm Cases* (2005) 126 Cal.App.4th 959, 986.) But in an apparent attempt to avoid the appearance of establishing policy, the majority has not taken into consideration the legislative policy reflected in related legislative enactments. "We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " (*Murphy*, *supra*, 25 Cal.4th at p. 142.) And we may look to related statutory enactments for insight concerning legislative intent and policy. (See *Cornett*, *supra*, 53 Cal.4th at pp. 1268-1269.) "It is our duty when interpreting statutes to adopt, if possible, a construction which avoids apparent conflicts between different statutory provisions, even if the provisions appear in different codes . . . ." (*People v. Kennedy* (2001) 91 Cal.App.4th 288, 292; see *id.* at pp. 292-293 (*Kennedy*) [interpreting the words "any person" in Bus. & Prof. Code, § 4060 to not be limited to pharmacists].)

The CSA itself contains a definition of " '[u]ltimate user' " of prescribed controlled substances broader than the prescription holder. That definition includes "a person who lawfully possesses a controlled substance for his own use *or for the use of a member of his household.*" (§ 11030, italics added.) Also included in the CSA is

---

[5] Although the trial court ultimately declined to modify the possession and transportation instructions here, the court recognized this dilemma. During the instruction conference the court observed, "these aren't wild scenarios in terms of prescription drugs, someone having someone's prescription drugs. There has to be something where if you are picking up someone's prescription for them, if you are a caretaker, or something of that nature, there's got to be some legal authority to have it, possess it, transport it, and --"

6

a definition for the word " 'dispense,' " which includes the delivery of a controlled substance to an "ultimate user" pursuant to the lawful order of a practitioner. (§ 11010.) These provisions reflect the Legislature's intent to allow spouses and others who live with a patient to possess and transport the patient's controlled substances.

Looking to a related statutory scheme for further insight, the Pharmacy Law, Business and Professions Code section 4060, provides, "No person shall possess any controlled substance, except that furnished to *a person upon the prescription of a physician . . . .*" (Italics added.) As in the Health and Safety Code possession and transportation statutes, this language does not expressly limit the prescription exception to the prescription holder.

On the other hand, other Pharmacy Law provisions expressly allow a pharmacist to dispense prescribed controlled substances to a patient's "agent" or "representative" without requiring that the agent or representative be the patient's household member who would qualify as an ultimate user under the CSA.[6] (Bus. & Prof. Code, §§ 4059.5,

---

[6] I also note that Pharmacy Board regulations authorized by the Pharmacy Law (Bus. & Prof. Code, §§ 4001, subd. (a), 4001.1, 4005, 4006) also refer to the patient's "agent." (Cal. Code Regs., tit. 16, § 1707.2 [pharmacist shall provide oral consultation to patient "or the patient's agent" unless consultation is refused by patient or agent]; see *Huggins v. Longs Drug Stores California, Inc*. (1993) 6 Cal.4th 124, 132 [purpose of consultation with the patient's "agent" is "to assure that the pharmacist's advice is put to good use for the benefit of the patient"]; Cal. Code Regs., tit. 16, § 1707.1(a)(1)(C) [pharmacy shall maintain certain information communicated by the patient "or the patient's agent"]; Cal. Code Regs., tit. 16, § 1793.1(b) [pharmacist may "[c]onsult with a patient or *his or her agent* regarding a prescription" (italics added)]; Cal. Code Regs., tit. 16, § 1714.1(b) [patient or "patient's agent" may pick up refills]; Cal. Code Regs., tit. 16, § 1707.4(b) ["Nothing in this section shall be construed as barring a pharmacy from also filling new prescriptions presented by a patient *or a patient's agent . . .*" (italics added)]; Cal. Code Regs., tit. 16, § 1711(b) [medication error does not include any variation that is corrected before furnishing the drug to the patient "or patient's agent"].)

subd. (b), 4075.)[7]  These provisions show that the Legislature has not intended the absurd consequences that result from a narrow interpretation of the possession and transportation statutes and has not intended to limit the possession and transportation of controlled substances to the person for whom the prescription was written.

Indeed, a predecessor version of Business and Professions Code section 4060 stated, "No person shall have in possession any hypnotic drug . . . except that furnished to *such person* upon the prescription of a physician . . . ."  (Bus. & Prof. Code, former § 4230, Stats. 1955, ch. 550, § 3, p. 1047, italics added.)  In 1996, the wording "such person" -- which easily lends itself to the narrow construction limiting the authority to possess the prescribed drugs to the prescription holder -- was changed to "a person," and the section was renumbered to the current section 4060, as part of a comprehensive legislative reorganization of the Pharmacy Law.  (Stats. 1996, ch. 890, § 3, p. 4875 (Assem. Bill No. 2802).)  The legislative history does not explain the change from "such person" to "a person."  It indicates the general purpose of the reorganization was to clarify a "complex and convoluted" law without making substantive changes.  (Legis. Counsel's Dig., Assem. Bill No. 2802 (1995-1996 Reg. Sess.); Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2802 (1995-1996 Reg. Sess.) as amended August 8, 1996, p. 2.)  The legislative history also reveals the intent

---

[7]  Business and Professions Code section 4059.5, subdivision (b) provides:  "A dangerous drug or dangerous device transferred, sold, or delivered to a person within this state shall be transferred, sold, or delivered only to an entity licensed by the board, to a manufacturer, or to an ultimate user *or the ultimate user's agent*."  (Italics added.)

Business and Professions Code section 4075 provides:  "No prescription for a controlled substance transmitted by means of an oral or electronically transmitted order shall be furnished to any person unknown and unable to properly establish his or her identity.  The board may by regulation establish procedures to prevent unauthorized persons from receiving prescription drugs furnished to a patient *or a representative of the patient*."  (Italics added.)

8

to "remove obsolete provisions." (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2802 (1995-1996 Reg. Sess.) as amended May 7, 1996.) Thus, the legislative history does not support either a construction which would allow persons other than the patient to possess prescribed drugs or one that limits legal possession to the prescription holder. But in the context of the various statutes involving prescription medications, which allow people other than a prescription holder to lawfully handle the prescription holder's drugs, I believe it is telling that the Legislature dropped specific language that more clearly limits the availability of the prescription defense to the prescription holder.

Decisional law also suggests the prescription defense is available to persons other than the prescription holder. (*Ard*, *supra*, 25 Cal.App.2d 630; *Wallace*, *supra*, 109 Cal.App.2d 676.) I disagree with the majority's dismissal of these cases.

In *Ard*, the defendant was a nurse prosecuted for possessing his patient's prescription drugs a month after the patient died. The court in *Ard* concluded the defendant's right to possess ceased upon the patient's death. (*Ard*, *supra*, 25 Cal.App.2d at p. 631.) "Although appellant did at one time come within the exception that it is unlawful to possess narcotics 'except *upon the written order or prescription of a physician* and surgeon', his possession on the day of his arrest--some thirty days after the death of the patient--was not a possession upon such written order or prescription, even though he originally obtained the narcotics upon a valid prescription during the lifetime of his said patient." (*Ibid.*, italics added.) Even if dictum, as asserted by the majority, the court's reasoning in *Ard* is consistent with the view that possession of a controlled substance by someone other than the person for whom the controlled substance is prescribed could be lawful.

In *Wallace*, a guest inadvertently left his prescription narcotics in the hotel room where the defendant resided. Two weeks later the police conducted a search of the premises and found the pill bottle. When found, the pill bottle contained fewer

9

pills than when left by the guest. Charged with unlawful possession, the defendant claimed she was the involuntary custodian of her guest's prescription narcotics. (*Wallace*, *supra*, 109 Cal.App.2d at pp. 677-678.) In a court trial, the trial court found the defendant guilty of unlawful possession. On appeal, the defendant contended that when a guest legally obtains narcotics and inadvertently leaves them at the home of his hostess, the retention of the drugs by the hostess is not unlawful possession. (*Id*. at p. 679.) The Court of Appeal observed, "If these were the facts there might be merit in the argument," but those were not the facts most favorable to the prosecution. (*Ibid*.) The court concluded that despite the guest's prescription, which could have made the defendant's possession lawful, the evidence showed that the defendant had assumed dominion and control by using some of the pills, so the evidence was sufficient to support her conviction. (*Id.* at pp. 679-680.) Specifically, the court stated, "While the accused may defend on the ground that his possession was lawful because the narcotics were secured by a prescription issued to him, the fact that the prescription was issued to another does not conclusively prove that the accused's possession was lawful. If the trial court had believed the testimony that [the defendant] was merely the involuntary custodian of the tablets inadvertently left in her home by [the guest], it would have been justified in finding that her possession was not unlawful. But it was not required to believe that testimony. . . . In the instant case the trial court was justified in believing that, even if [the guest] did leave the narcotics in [the defendant's] possession inadvertently, [the defendant] assumed control, dominion and possession of them for the purpose of using them herself. This would render her possession unlawful. [¶] . . . Even if [the defendant's] possession . . . was originally lawful, by her exercising dominion over the tablets and consuming some of them, her possession became unlawful." (*Id.* at pp. 679-680.) Thus, *Wallace* suggests that possession of prescribed drugs for purposes of safekeeping by someone other than the patient is lawful, but if that person converts the drugs for her own purposes, the possession is unlawful.

10

This view is supported by a 1988 Attorney General opinion referenced by the trial court in this case, but now effectively disavowed by the People and criticized by the majority. The Attorney General opinion relied, in part, on *Ard* and *Wallace* when asked to consider whether a home care companion who was not a health care professional could lawfully administer drugs to the employer. (71 Ops.Cal.Atty.Gen. 190 (1988).) The Attorney General concluded a home care companion hired to perform services in the employer's home, whether certified as a nurse assistant or home health aide or uncertified and unlicensed, could not lawfully administer controlled substances to the employer but could lawfully possess the controlled substances when that possession is "consistent with the prescription," e.g., picking up the drugs at the pharmacy and transporting them to the employer's home at the employer's request. (*Id*. at pp. 191-193.)

Additional support for a construction including within the scope of the California prescription defense a patient's agent who possesses or transports the drugs for the patient's benefit can be found in federal case law construing the federal Controlled Substances Act's prohibition against possession of controlled substances unless obtained "pursuant to a valid prescription." (21 U.S.C. § 801 et seq., see § 844(a); *United States v. Forbes* (D.C. Cir. 1975) 515 F.2d 676 (*Forbes*).) While federal law does not control our interpretation of California statutes (*People v. Mower* (2002) 28 Cal.4th 457, 465, fn. 2 (*Mower*)), federal cases interpreting federal law may provide guidance in our interpretation of California statutes that have language and objectives parallel to the federal statutes (*Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 658 [labor relations law]). California enacted the CSA in 1972 (Stats. 1972, ch. 1407, p. 2987 et seq.) to bring California into substantial conformity with the federal Controlled Substances Act, specifically with respect to federal schedules classifying controlled substances (*Kennedy*, *supra*, 91 Cal.App.4th at p. 296 ["overall purpose of the Health and Safety Code revision was to harmonize state and federal drug laws"]; accord, *People v. Lazenby* (1992) 6 Cal.App.4th 1842, 1845 ["California Uniform

11

Controlled Substances Act was enacted to bring California into substantial conformity with the federal law"]; 2 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against Public Peace and Welfare, §§ 84, 86, pp. 726, 729).

Section 844(a) of title 21 of the United States Code provides in pertinent part, "It shall be unlawful for any person knowingly or intentionally to possess a controlled substance *unless* such substance was obtained directly, or *pursuant to a valid prescription or order*, from a practitioner, while acting in the course of his professional practice . . . ." (Italics added.)  This language is not identical but is similar to the California statutes allowing possession "upon the" prescription of a physician.  (Health & Saf. Code, former §§ 11350, subd. (a), 11352, subd. (a), 11377, subd. (a).)  I have found no case that construes the words "person" and "prescription" in this statute as the majority construes those words here.

To the contrary, in *Forbes*, the D.C. Circuit Court interpreted the federal prescription defense and held "*in the case of someone other than the patient named in the label, possession can be pursuant to the prescription only if he is acting on behalf of the patient and in the course of carrying out the purpose of the prescription, i.e., if he is acting as the agent of the patient.*  This latter result flows from the general rule of law that whatever any person is legally capable of doing himself, he can do through another as his agent.  Since the patient can lawfully possess drugs issued pursuant to a prescription in his name, it should follow that he can lawfully authorize another to possess the drugs as his agent *for purposes consistent with the prescription.*  It is of course true that Congress did not specifically state that this type of agency relationship is a valid defense to a charge of unlawful possession of a controlled substance, but *we are convinced that the necessity for the patient to create such relationships is sufficiently common that Congress could not have reasonably contemplated that possession by an agent of the patient in the course of carrying out the purpose of the prescription would be*

12

*unlawful* under section 844(a)." (*Forbes*, *supra*, 515 F.2d at pp. 680-681, some italics added, fns. omitted.)

Like the court in *Forbes*, I conclude that the necessity for the patient to allow other people to possess and transport prescription medications is sufficiently common that our Legislature could not reasonably have contemplated that possession or transportation by a person so authorized by the patient would be unlawful as long as the possession or transportation is consistent with the prescription. Indeed, as I have noted, related California statutes allow the patient's "agent" (Bus. & Prof. Code, § 4059.5, subd. (b)) or "representative of the patient" (Bus. & Prof. Code, § 4075) to possess the patient's prescribed medications.

Other states apply the prescription defense to the patient's agent. (E.g., *McCoy v. State* (Fla.App. 2010) 56 So.3d 37 (*McCoy*).) California courts may find the decisions of courts in sister states to be persuasive where similar statutes are at issue. (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 269.)

In *McCoy*, the defendant carried her husband's pills because his work clothes lacked pockets. The Florida statute provides that " 'It is unlawful for any person to be in actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner . . . .' " (*McCoy*, *supra*, 56 So.3d at p. 39, quoting Fla. Stats. § 893.13(6)(a).) The Florida District Court of Appeal construed "lawfully obtained" as authorizing possession by persons who have a legally recognized reason for the possession. (*McCoy*, *supra*, 56 So.3d at p. 39.) As in California, Florida statutes governing pharmacies allow pharmacies to dispense medications to a patient or the patient's agent. (*Ibid*.) Noting that the defendant asserted she was holding her husband's pills on his behalf, the court reasoned that, if true, the defendant's assertion established an agency relationship authorizing the defendant's possession of the pills. (*Ibid*.; see also *Ayotte v. State* (Fla. App. 2011) 67 So.3d 330 [a defendant who was holding his

13

girlfriend's prescribed pills because she had no pockets in her evening attire was entitled to a prescription defense instruction].)

The court in *McCoy* noted case law from Utah and Missouri holding that the prescription defense applied to persons other than the prescription holder. (*McCoy*, *supra*, 56 So.3d at p. 39.) In *State v. Miller* (Utah 2008) 193 P.3d 92 (*Miller*), the Utah Supreme Court reversed a conviction for failure to instruct on an "innocent possession" defense where a homeowner cleaning up after a party possessed a pill bottle left behind by a guest, intending to return it to the guest. (*Miller*, *supra*, at pp. 93-94, 95.) The court held that the innocent possession defense allows for the temporary possession of a controlled substance for the purpose of returning it to its lawful owner. (*Miller*, *supra*, 193 P.3d at p. 97.) In *State v. Blocker* (Mo. 2004) 133 S.W.3d 502 (*Blocker*), the defendant was charged with the possession of a controlled substance he claimed had been prescribed to his grandmother. That state's prescription defense statute provided, "A person may lawfully possess or have under his control a controlled substance if such person obtained the controlled substance *directly from*, *or pursuant to*, *a valid prescription* or order of a practitioner." (*Id*. at p. 504.) The Missouri Supreme Court held that the language "pursuant to" a valid prescription could provide a defense for people who share a household with the prescription holder because the pharmacy law in that state (like that in California) allowed drugs to be dispensed to an "ultimate user," defined as the patient or a household member. (*Blocker*, *supra*, at pp. 504-505.)

The courts in *Miller* and *Blocker* pointed out absurd consequences that could result if only the prescription holder could assert the prescription defense, e.g., a daughter who no longer lives with her mother but picks up the mother's prescription and drives it to the mother's home (*Miller*, *supra*, 193 P.3d at p. 96) or a husband or wife who has constructive possession of a spouse's drugs kept in their shared bathroom medicine cabinet (*Blocker*, *supra*, 133 S.W.3d at p. 505).

14

Here, the People argue that, even if the prescription defense were construed to apply to possession consistent with the prescription, it would not apply in this case, where defendant was not the prescription holder's "caregiver" and was not transporting the drugs from the pharmacy to the holder's home. But I see no reason to limit "possession . . . consistent with the prescription" to those scenarios.

Based on the authorities I have discussed, I would construe the statutory language in former sections 11350, subdivision (a), 11377, subdivision (a) and 11352, subdivision (a) -- "upon the . . . prescription of a physician" -- to mean that the possession or transportation of the controlled substance must be consistent with the prescription.[8] Based on the same authorities, I conclude that possession or transportation of a controlled substance is consistent with the prescription when that possession or transportation benefits the prescription holder by facilitating the prescribed use of the drug. Such possession or transportation is lawful. On the other hand, any possession or transportation that does not facilitate the prescribed use of the drug by the prescription holder is inconsistent with the prescription and is unlawful.

For example, if the defendant uses, sells, or gives the drug away or deprives the patient of the benefit for which the medication was prescribed, even if the patient

---

[8] I do not base my interpretation of the statutes on the rule of lenity construing criminal statutes in the defendant's favor, as urged by defendant. The rule of lenity applies " ' "only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule." ' [Citation.] In other words, 'the rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in relative equipoise . . . .' " ' [Citation.]" (*People v. Manzo* (2012) 53 Cal.4th 880, 889.) There is egregious ambiguity and uncertainty here with regard to the question of whether the Legislature intended to limit the prescription defense to the person who holds the prescription. Yet, if the Legislature intended to apply the prescription defense to someone other than the prescription holder, it must still be determined to whom the Legislature intended the defense to apply and under what circumstances. Thus, the issue presented here cannot be resolved by simply applying the rule of lenity.

15

authorized the defendant to do so, such conduct would not be consistent with the prescription and is unlawful. *Wallace* is an example of conduct that deprived the patient of the beneficial use of the prescribed medication. Also, even if the defendant or a third person does not benefit, possession or transportation would not be consistent with the prescription unless the prescribed use of the drug by the prescription holder is facilitated. *Ard* is one example of such conduct.

I would also conclude that the question whether possession or transportation is consistent with the prescription is a question to be determined by the trier of fact. A defendant need only raise a reasonable doubt as to whether the possession or transportation is lawful because the possession or transportation is consistent with the prescription. The ultimate burden is on the prosecution to prove the possession or transportation is unlawful. (*Mower*, *supra*, 28 Cal.4th at pp. 479-483 [a defendant need only raise a reasonable doubt about whether his or her possession of the drug is lawful because of a valid prescription]; *People v. Montalvo* (1971) 4 Cal.3d 328, 333, fn. 3.)

Whether the evidence supports an instruction on this defense should be determined by the usual rules. The trial court should simply determine whether there is sufficient evidence for a reasonable jury to find in favor of defendant, i.e., whether there is sufficient evidence, if believed, to raise a reasonable doubt. (*People v. Salas* (2006) 37 Cal.4th 967, 982-983 (*Salas*).) The court must make this determination without reference to the credibility of witness testimony supporting the defense. (*Ibid*.; see also *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549-1551 [even though the chance that the defendant would prevail in convincing a jury that her transportation of two pounds of marijuana was for her personal medical use was "remote," the defendant was entitled to an instruction on that point].)

Contrary to the majority view, construing the prescription defense to include possession or transportation by the prescription holder's agent for the prescription holder's benefit does not add a specific intent element to the statutes. The authority

16

cited by the majority, *People v. Martin* (2001) 25 Cal.4th 1180 (*Martin*), held that the defense of "transitory" possession of drugs for the sole purpose of disposal could not be expanded to include nontransitory possession, because to do so would inject a new element of specific intent to retain.[9] (*Id*. at pp. 1182, 1190-1191.) However, application of the prescription defense to possession or transportation by a prescription holder's agent consistent with the prescription contemplates that the trier of fact will determine whether the possession or transportation is objectively consistent with the prescription. A defendant's stated intent, as well as that of the person for whom the controlled substance is prescribed and other factual circumstances are all considerations for the jury. But that does not convert the offenses from general intent to specific intent crimes. Indeed, *Martin* supports the proposition that general intent possession crimes may be defended on grounds of innocent intent.

In *Martin*, our high court addressed the parameters of the transitory or momentary possession defense, reaffirming its holding in *People v. Mijares* (1971) 6 Cal.3d 415, 419, 422 (*Mijares*), that the possession has to be both momentary and for the purpose of disposal for the defense to apply. (*Martin*, *supra*, 25 Cal.4th at p. 1191.) *Martin* stated, " 'When a defendant relies on the *Mijares* defense, he or she *essentially admits the commission of the offense of simple possession of narcotics*: The defendant exercised control over the narcotics, he or she knew of its nature and presence, and possessed a usable amount. [Citation.] However, the defendant additionally asserts that he or she possessed the narcotics for the limited purpose of disposal, abandonment, or destruction. *Mijares* does not serve to negate an element of the offense of possession of narcotics. Instead, it offers a judicially created exception of lawful possession under certain specific

---

[9] The transitory possession defense does not apply here, because defendant did not intend to dispose of the drugs, and his possession was not transitory.

circumstances as a matter of public policy, similar to the defenses of entrapment and necessity.' " (*Martin*, *supra*, 25 Cal.4th at p. 1191, italics added.)

Similarly, a construction applying the prescription defense to the prescription holder's agent or representative does not convert the offenses of possession and transportation of controlled substances to specific intent crimes. Defendant intentionally exercised control over the pills, knew what they were and knew that he possessed them, and there was clearly a usable amount. Thus, similar to *Mijares*, defendant here essentially admits all the elements of the possession and transportation offenses, but asserts his conduct was innocent, because his possession and transportation were consistent with the prescription, and thus, fall within the legislative exception, "upon the" prescription of a physician. (Former §§ 11350, subd. (a), 11377, subd. (a), 11352, subd. (a).)

## B. Substantial Evidence

There remains the question whether the requested instructions were supported here by substantial evidence -- evidence which, if believed by a rational jury, would have raised a reasonable doubt as to whether defendant *unlawfully* possessed or transported his friend's prescription medications. (*Salas*, *supra*, 37 Cal.4th at pp. 982-983; *People v. Mentch* (2008) 45 Cal.4th 274, 288.)

I conclude there is sufficient evidence from which a rational jury could conclude defendant possessed and transported the pills for the benefit of the prescription holder, his friend Timothy T., to facilitate the later use of those medications by Timothy. Defendant had the pills only because Timothy asked him to take the pills to Timothy's new home during the course of the move. Defendant knew Timothy had cancer and wanted Timothy to have his pills. There is no evidence defendant used any of the pills or otherwise possessed or transported the pills for his own benefit. Although defendant was not Timothy's regular care provider, defendant had helped care for Timothy in the past. And Timothy's regular care provider, Peggy O., had nowhere to keep the pills. Timothy

18

testified he was the owner of the pills found on defendant, and it is undisputed that Timothy had valid prescriptions. While it would be up to the jury to decide whether, under the totality of the circumstances, defendant's possession or transportation while off on a side trip was at that time benefiting Timothy by facilitating the prescribed use of the drugs, the evidence, if believed, could have raised a reasonable doubt on that point.

## C. Harmless Error Analysis

Defendant claims the error here was prejudicial because he relied on a defense on which the trial court refused to instruct. Citing *People v. Wright* (2006) 40 Cal.4th 81, 98 [where our high court declined to decide which harmless error standard applies to a trial court's failure to instruct on a defense], the People argue that any error here was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (whether the error was harmless beyond a reasonable doubt) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (whether it is reasonably probable a result more favorable to defendant would have been rendered in the absence of the error). I would conclude the error was not harmless under either standard.

The People contend that "the jury could not have found that [defendant] possessed or transported the controlled substances in a manner consistent with the prescription," noting that three different drugs belonging to Timothy T. were in an unmarked pill container, defendant was not Timothy's caretaker, he was not transporting the pills from the pharmacy or to Timothy's home, and defendant was not an involuntary custodian since Timothy had asked defendant to hold the pills for him. Further, defendant knew his possession was unlawful, having told the officer that the drugs belonged to him, and only claiming at trial that the drugs belonged to Timothy and that he planned to return them.

The People ignore that during deliberations, the jury repeatedly asked, and only asked, about wrongful intent. The jury first asked for clarification on general intent and, before receiving an answer to that question, asked "If . . . we may consider no wrongful intent: [¶] . . . [¶] Is there a timeline for no wrongful intent[?]" (Original underscoring.)

19

The court's answer to the jury's first question reiterated the principle of general intent and said there need not be an intent to break the law.  After providing its answer to the first question, the court informed the jury that the second question would be answered if the jury still had questions.  Thereafter, the jury requested readback of the testimony of Officer Thomas and defendant, but then asked for a response to its second question.  The court's answer to the second question was that the instructions required proof of the union of act and wrongful intent, and if the jury found the elements of the offenses proven beyond a reasonable doubt, it must also find that defendant intended to commit the acts when they were committed.  The jury returned its verdict shortly after the court responded to the jury's last inquiry.[10]  The deliberations clearly focused on issues related to the defense defendant sought to advance -- a defense for which there was no basis in the instructions the jury received.[11]  Indeed, during closing argument, the prosecutor capitalized on this circumstance, conceding that defendant "[p]robably . . . came into possession of the pills [be]cause they broke on Mr. T[.], and Mr. T[.] handed them to him," but arguing that under the law given to the jury, it did not matter whether the jurors believed defense witnesses.  (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [in concluding there was no reversible error, the court considered the arguments of counsel and whether the jury sought clarification of the instructions challenged on appeal].)  Yet, the jury could have believed that defendant and the defense witnesses were telling the truth at trial, that defendant told the officer the drugs were his to prevent a company car

---

[10]  The record is not entirely clear on the timing.  The jury requested the readback at 3:30 p.m.  The record does not indicate the time that the jury asked that its second question be answered or the time the court provided its response.  However, at 4:57 p.m., the jury announced it had reached verdicts.

[11]  I do not rely on defense counsel's declaration in support of the motion for new trial, in which he memorialized concerns expressed by a juror at the end of the trial.  That declaration is inadmissible.  (Evid. Code, §§ 1150, 1200.)

from being seized and losing his job, and that Timothy T.'s prescribed use of the drug was facilitated by defendant taking custody of the drugs. The instructions, nevertheless, compelled the jury to convict defendant.

I would conclude the error was not harmless and reverse the judgment.


                                                                  _____MURRAY_____, J.

21